## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| 18 KT.TV, LLC, | : | CIVIL ACTION |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | NO. 3:11-cv-00244-JMM |
| | : | |
| ENTEST BIOMEDICAL, INC., | : | [Filed Electronically] |
| BIO-MATRIX SCIENTIFIC | : | |
| GROUP, INC. and | : | |
| DAVID R. KOOS, | : | |
| | : | [J. Munley] |
| Defendants. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS ENTEST BIOMEDICAL, INC.'S,
## BIO-MATRIX SCIENTIFIC GROUP, INC.'S and DAVID R. KOOS'
## FED. R. CIV. P. 12(b) MOTIONS

Elizabeth J. Goldstein, Esquire
Attorney I.D. No.
egoldstein@dilworthlaw.com
Victor P. Stabile, Esquire
Attorney I.D. No. 37449
vstabile@dilworthlaw.com
John B. Consevage, Esquire
Attorney I.D. No. 36593
jconsevage@dilworthlaw.com
Dilworth Paxson LLP
112 Market Street, 8th Floor
Harrisburg, PA 17101
(717) 236-4812 (phone)
(717) 236-7811 (fax)
*Attorneys for Defendants*

# TABLE OF CONTENTS

I.   Procedural History ............................................................... 1

II.  Statement of Facts................................................................ 1

III. Statement of Questions Presented .......................................... 2

IV.  ARGUMENT ...................................................................... 3

    A.    LEGAL STANDARDS................................................... 3

          *1.*    12(b)(6) .............................................................. 3
          2.    Fed. R. Civ. P. 12(e). ........................................ 5
          3.    Applicable Law.................................................. 5

    B.    IF THE COURT FINDS THAT PLAINTIFF
        ADEQUATELY PLED A BREACH OF
        CONTRACT COUNT AGAINST EACH OF THE
        CORPORATE DEFENDANTS, THEN IT
        SHOULD DISMISS THE IMPLIED IN FACT
        AND QUASI-CONTRACT CLAIMS
        CONTAINED IN THE COMPLAINT. .................................. 6

          *1.*    *Counts II and V for Implied in Fact Contract*
                *cannot be maintained when a written*
                *contract has been executed by the parties.* ...................... 6
          *2.*    *Counts III and VI for Unjust Enrichment*
                 *cannot be maintained when a written*
                *contract has been executed by the parties.* ...................... 7

    C.    PLAINTIFF DOES NOT ALLEGE FACTS
        SUFFICIENT IN COUNTS II, III, V, VI, VII,
        AND VIII TO MEET THE PLEADING
        STANDARD SET FORTH IN FED. R. CIV. P.
        8(a) (2). ....................................................................... 8

          *1.*    *Counts against the Corporate Defendants* ...................... 9
          *2.*    *Counts against Koos* ...................................... 10
                a.    Participation Theory-Count VII .......................... 11
                b.    Pierce Corporate Veils-Count VIII....................... 13

    D.    THE PLAINTIFF'S CLAIMS FOR ATTORNEYS
        FEES AND PUNITIVE DAMAGES SHOULD
        BE STRICKEN. ........................................................ 16

V.   Conclusion ........................................................................ 19

# TABLE OF AUTHORITIES

## Cases

Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56 (3d Cir. 1982) ......................................................................... 5

Aschcroft v. Iqbal, ___ U.S. ___, 129 S. Ct. 1937 (2009) ................ 4, 10, 13

Baer v. Chase, 392 F.3d 609, 616-17 (3d Cir. 2004) ..................................... 7

Bank of Guam v. U.S., 578 F.3d 1318, 1329 (Fed. Cir. 2009) ...................... 7

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). ..................... 4, 10, 13

Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh, 776 F.2d 1174, 1177 (3d Cir. 1985) ........................................... 7

Birchwood Lakes Community Association, Inc. v. Comis, 442 A.2d 304, 309 (Pa. Super. Ct. 1982) ........................................ 8

Blue Mountain Mushroom Company v. Monterey Mushroom, Inc., 246 F. Supp.2d 394, 402 (E.D. Pa. 2002) ........................... 12

Coghlan v. Wellcraft, 240 F.3d 449, 454 (5th Cir. 2001) ............................ 8

Constar Inc. v. Nat'l Distrib. Ctrs., Inc. 101 F. Supp. 2d 319, 324 (E.D. Pa. 2000) ................................................................. 8

Curlett Family Limited Partnership, Ltd. v. Particle Drilling Technologies, Inc., 254 Fed. Appx. 320, 2007 WL 3340845 (5th Cir. 2007) ..................................................................... 17

Elias v. Elias, 237 A.2d 215 (Pa. 1968) ...................................................... 6

Feldman v. Google, Inc., 513 F. Supp.2d 229, 239 (E.D. Pa. 2007) ..................................................................................... 7

First Realvest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 603 (Pa. Super. Ct. 1991) ......................................................... 11

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) ..................................................................................... 4

Harold v. McGann, 406 F. Supp. 2d 562, 578-79 (E.D. Pa. 2005) ..................................................................................... 8

Hershey Foods Corp. v. Ralph Chapek Inc., 828 F.2d 989, 999 (3d Cir. 1987) ..................................................................... 8

## TABLE OF AUTHORITIES

(continued)

Lackner v. Glosser 892 A.2d 21, 30 (Pa. Super. Ct. 2006) ............................ 8

Loeffler v. McShane, 539 A.2d 876, 879 (Pa. Super. Ct. 1988) .................. 11

Lorrison v. Lorrison, 750 A.2d 895, 898 (Pa. Super. Ct. 2000).................... 5

Lumax Industries, Inc. v. Aultman, 669 A.2d 893, 895 (Pa. 1995) .................................................................................. 15

McMullen v. Kutz, 985 A.2d 769, 775 (Pa. 2009) ...................................... 16

Pearson v. Component Technology Corp., 247 F.3d 471 (3d Cir. 2001) ................................................................................. 15

Peerless Heater Co. v. Mestek, Inc., 2000 WL 637082, *11 (E.D.Pa. May 11, 2000) ........................................................... 11

Phico Insurance Co. v. Presbyterian Medical Services Corp., 663 A.2d 753, 757 (Pa. Super. Ct. 1995)...................................... 12

Philadelphia Housing Authority v. CedarCrestone, Inc., 562 F. Supp.2d 653, 655 (E.D. Pa. 2008) ............................................. 8

Phillips v. County of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008) .......................................................................................... 5

Rock v. Voshell, 397 F.Supp.2d 616, 627 (E.D.Pa. 2005).......................... 13

Roedler v. Department of Energy, 255 F.3d 1347, 1353-54 (Fed. Cir. 2001)........................................................................... 7

Schaedler v. Reading Eagle Publications, Inc., 370 F.2d 795, 798 (3d Cir.1967) ....................................................................... 5

Siematic Mobelwerke Gmbh & Co. Kg v. Siematic Corporation, 643 F.Supp.2d 675, 694 (E.D. Pa. 2009)........................... 14

Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc., 496 A.2d 840, 844 (Pa. Super. Ct. 1985).................................... 18

Thorsen v. Iron & Glass Bank, 476 A.2d 928, 932 (Pa. Super. Ct. 1984)....................................................................................... 18

Trevino v. Merscorp, Inc., 583 F. Supp.2d 521, 528-531 (D. Del. 2008)...................................................................................... 15

Trustees, Nat. Elevator Indus. Pension v. Lutyk, 332 F.3d 188, 194 (3d Cir. 2003) .................................................................... 15

## TABLE OF AUTHORITIES

(continued)

<u>Wicks v. Milzoco Builders, Inc.</u>, 470 A.2d 86, 90 (Pa. 1983) ..................... 11

**Rules**

Fed. R. Civ. P. 8 ................................................................................ 10, 11

Fed. R. Civ. P. 12 .............................................................................. 4, 5, 9

**Other Authorities**

Restatement (Second) of Contracts at Section 4, 19 (1979) .......................... 6

## I.    Procedural History

18K.TV, LLC ("plaintiff"), initiated this action by filing a Complaint on February 3, 2011.    Defendants Entest Biomedical, Inc. ("Entest"), Bio-Matrix Scientific Group, Inc. ("Bio-Matrix" and collectively with Entest the "Corporate Defendants"), and David R. Koos ("Koos") timely filed a Motion to Dismiss pursuant to Fed. R. Civ. P. 12 on April 11, 2011.   In response, plaintiff filed an Amended Complaint on April 18, 2011.   The Amended Complaint centers on plaintiff's provision of consulting services to the Corporate Defendants and asserts, among other things, breach of contract.   It asserts a new count against Koos entitled, "Pierce Corporate Veils of Entest & Bio-Matrix."   The remaining causes of action are from the original complaint and consist of counts against the Corporate Defendants for (i) breach of contract, (ii) breach of implied-in-fact contract, and (iii) unjust enrichment, and a count against Koos pursuant to the participation theory. The defendants timely filed Motions to Plaintiff's Amended Complaint pursuant to Fed. R. Civ. P. 12 (the "Motion") on May 2, 2011. This Memorandum is in support of the Motion.

## II.    Statement of Facts

Accepting the averments of the Complaint as true, the following is a summary of the relevant facts. On August 11, 2009, plaintiff, a single member

1

limited liability company, entered into a written agreement (contained in Exhibit "A" to the Amended Complaint ("A.C.")) with Bio-Matrix, a corporation formed in Delaware, and another written agreement (contained in A.C. Exhibit "B") with Entest, a corporation formed in Nevada, on August 25, 2009.  A.C. ¶ ¶ 3, 5, 13. Koos signed these agreements on behalf of the Corporate Defendants.   A.C. Exhibits "A" and "B".   These written agreements concerned consulting services, including web based marketing services, that plaintiff would provide to the Corporate Defendants.  A.C. ¶ ¶ 21, 22, 31.  The Corporate Defendants agreed to pay plaintiff in company stock.  A.C. ¶ ¶ 23, 32, 33.  The Corporate Defendants have failed to pay plaintiff all of the stock owed under the agreements. A.C. ¶ ¶ 27, 56.

### III.   Statement of Questions Presented

1.   Should the Court dismiss the implied in fact and unjust enrichment claims if it finds that plaintiff adequately pled breach of a written contract?

Suggested Answer: Yes.

2.   Is the unjust enrichment claim raised against each Corporate Defendant legally insufficient under the federal notice pleading standard because the relevant allegations are nothing more than a formulaic recitation of the cause of action?

Suggested Answer: Yes.

3.      Is the implied in fact contract claim raised against each Corporate Defendant legally insufficient under the federal notice pleading standard because the relevant allegations are nothing more than a formulaic recitation of the cause of action?

Suggested Answer: Yes.

4.      Is the participation theory claim against Koos legally insufficient under the federal notice pleading standard because the relevant allegations are nothing more than a formulaic recitation of the cause of action and the Corporate Defendants have not committed any underlying tort?

Suggested Answer: Yes.

5.      Is the piercing the corporate veil claim against Koos legally insufficient under the federal notice pleading standard because the claim does not put Koos on notice to what legal action plaintiff is pursuing and the relevant allegations are not adequately developed?

Suggested Answer: Yes.

6.      Should the Court dismiss plaintiff's requests for attorneys fees when no statute or agreement provides for attorneys fees?

Suggested Answer: Yes.

7.      Should the Court dismiss plaintiff's requests for punitive damages when all of the actions sound in contract?

Suggested Answer: Yes.

## IV.   ARGUMENT

### A.   LEGAL STANDARDS

#### 1.   12(b)(6)

The United States Supreme Court in the last several years has clarified the

standards for courts to assess complaints upon motions to dismiss. A claim should

be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) if it does not allege "enough facts

to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v.

Twombly, 550 U.S. 544 (2007). A complaint must set forth "more than labels and

conclusions" or "a formulaic recitation of the elements of a cause of action" in

order to survive a 12(b)(6) motion. Twombly, 550 U.S. 555; Aschcroft v. Iqbal,

___ U.S. ___, 129 S. Ct. 1937 (2009). In Iqbal, the Supreme Court explained that

a complaint must contain:

> more than an unadorned, the-defendant-unlawfully-
> harmed-me accusation. . . .Nor does a complaint suffice
> if it tenders "naked assertion[s]" devoid of "further
> factual enhancement."

123 S. Ct. at 1949-50 (quoting Twombly, 550 U.S. 544).

In explaining the correct analysis for a 12(b)(6) dismissal post-Twombly and

Iqbal, the Third Circuit has emphasized the significance of pleaded facts:

> when presented with a motion to dismiss for failure to
> state a claim, district courts should conduct a two-part
> analysis. First, the factual and legal elements of a claim
> should be separated. The District Court must accept all of
> the complaint's well-pleaded facts as true, but may
> disregard any legal conclusions. Second, a District Court
> must then determine whether the facts alleged in the
> complaint are sufficient to show that the plaintiff has a
> plausible claim for relief.

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Iqbal,

129 S. Ct. at 1949-50 and Phillips v. County of Allegheny, 515 F.3d 224, 234-35

4

(3d Cir. 2008)) (quotations omitted).

### 2. *Fed. R. Civ. P. 12(e)*

In its Motion, defendants move in the alternative for a more definitive

statement under Fed. R. Civ. P. 12(e).  The Rule provides:

> A party may move for a more definite statement of a
> pleading to which a responsive pleading is allowed but
> which is so vague or ambiguous that the party cannot
> reasonably prepare a response.

This rule addresses instances when due to "vagueness or ambiguity of the pleading

the answering party will not be able to frame a responsive pleading."  Schaedler v.

Reading Eagle Publications, Inc., 370 F.2d 795, 798 (3d Cir.1967).

### 3. *Applicable Law*

A federal court sitting in diversity must apply the substantive law, including

the choice of law rules, of the state in which it sits. Appalachian Ins. Co. v. Liberty

Mut. Ins. Co., 676 F.2d 56 (3d Cir. 1982). Pennsylvania will apply its law unless it

conflicts with a sister state's law which has a nexus to the transaction.  Lorrison v.

Lorrison, 750 A.2d 895, 898 (Pa. Super. Ct. 2000).  The Pennsylvania law that is

applicable to the Motion does not conflict with that of  Nevada and Delaware, the

states in which the Corporate Defendants are incorporated, and thus, this

Memorandum addresses solely Pennsylvania law.

**B.** **IF THE COURT FINDS THAT PLAINTIFF ADEQUATELY PLED A BREACH OF CONTRACT COUNT AGAINST EACH OF THE CORPORATE DEFENDANTS, THEN IT SHOULD DISMISS THE IMPLIED IN FACT AND QUASI-CONTRACT CLAIMS CONTAINED IN THE COMPLAINT.**

1. *Counts II and V for Implied in Fact Contract cannot be maintained when a written contract has been executed by the parties.*

If the Court finds that plaintiff adequately pled a breach of contract action, then the implied in fact causes of action (Counts II and V) should be dismissed. An implied in fact contract arises when the parties' negotiations are inconclusive, but the parties continue to deal with one another, or when there is a general course of dealing, trade usage, or course of performance from which a contract may be inferred. Elias v. Elias, 237 A.2d 215 (Pa. 1968); see also Restatement (Second) of Contracts at Section 4, 19 (1979).

Plaintiff has produced written agreements that it avers covers the services it provided to the Corporate Defendants. Moreover, these written agreements contain integration clauses which provide that the:

> Agreement contains the entire agreement between the parties with respect to the subject matter therein. There are no other promises . . . express or implied. . . ."

A.C. Exhibit "A", Bio-Matrix Agreement, Section 8(g); A.C. Exhibit "B", Entest Agreement at Section 8(g) (emphasis added). Hence, the written agreements themselves recognize that they are incompatible with any implied in fact contracts.

6

The Third Circuit has recognized the incompatibility of implied in fact and express

contracts.

> [A] claim of an implied-in-fact contract, in the face
> of an express agreement governing the same
> subject matter, is legally untenable. There cannot
> be an implied-in-fact contract if there is an express
> contract that covers the same subject matter. In
> other words, express contract and implied-in-fact
> contract theories are mutually exclusive.

Baer v. Chase, 392 F.3d 609, 616-17 (3d Cir. 2004) (citations omitted); Feldman v.

Google, Inc., 513 F. Supp.2d 229, 239 (E.D. Pa. 2007).   When a party has

sufficiently pled a written contract between the parties, a cause of action of implied

contract for the same subject matter should be dismissed on a 12(b)(6) motion.

Bank of Guam v. U.S., 578 F.3d 1318, 1329 (Fed. Cir. 2009); Roedler v.

Department of Energy, 255 F.3d 1347, 1353-54 (Fed. Cir. 2001). Thus, Counts II

and V should be dismissed because they fail to state claims for which relief may be

granted.

> 2.   *Counts III and VI for Unjust Enrichment cannot be*
> *maintained when a written contract has been*
> *executed by the parties.*

The quasi-contractual doctrine of unjust enrichment is unavailable where a

contract expressly governs the relationship between the parties.  Benefit Trust Life

Ins. Co. v. Union Nat'l Bank of Pittsburgh, 776 F.2d 1174, 1177 (3d Cir. 1985)

(quoting Scott v. Westinghouse Elec. Corp., 259 A.2d 443, 448 (Pa. 1969)). Unjust

enrichment occurs when one party has and retains money or benefits that in justice and equity belong to another and a different legal remedy is lacking. Lackner v. Glosser 892 A.2d 21, 30 (Pa. Super. Ct. 2006); Hershey Foods Corp. v. Ralph Chapek Inc., 828 F.2d 989, 999 (3d Cir. 1987). Where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application. Constar Inc. v. Nat'l Distrib. Ctrs., Inc. 101 F. Supp. 2d 319, 324 (E.D. Pa. 2000) (citations omitted);  Birchwood Lakes Community Association, Inc. v. Comis, 442 A.2d 304, 309 (Pa. Super. Ct. 1982) ("Unjust enrichment is not applicable where the relationship among the parties is based on an express agreement."). Thus, claims of unjust enrichment should be dismissed on 12(b)(6) motion when an express contract governs the subject and relationship of the parties. Id.; see also Philadelphia Housing Authority v. CedarCrestone, Inc., 562 F. Supp.2d 653, 655 (E.D. Pa. 2008); Harold v. McGann, 406 F. Supp. 2d 562, 578-79 (E.D. Pa. 2005); Coghlan v. Wellcraft, 240 F.3d 449, 454 (5th Cir. 2001) (affirming district court's 12(b)(6) dismissal of unjust enrichment count because "a valid express contract governing the subject matter of the dispute exists).

        C.     **PLAINTIFF DOES NOT ALLEGE FACTS SUFFICIENT IN COUNTS II, III, V, VI, VII, AND VIII TO MEET THE PLEADING STANDARD SET FORTH IN FED. R. CIV. P. 8(a) (2).**

The factual allegations underpinning the claims against the Corporate Defendants in Counts II and V (Breach of Implied in Fact Contract), Counts III and

8

VI (Unjust Enrichment), and the claims against Koos in Counts VII (Participation Theory), and VIII (Pierce Corporate Veils) of the Amended Complaint do not provide sufficient notice to the defendants of plaintiff's claims and thus should be dismissed, or alternatively, plaintiff should be ordered to plead with more specificity pursuant to Fed. R. Cir. P.12(e).

### 1.    Counts against the Corporate Defendants

All of the factual allegations concerning the Corporate Defendants are contained in Amended Complaint Paragraphs 21 through 44.   However, these paragraphs relate to breach of written contracts.   They do not set forth facts to serve as a basis for an action against the Corporate Defendants for breach of an implied-in-fact contract or unjust enrichment.   In substance, the allegations of Counts II and V (Breach of Implied in Fact Contract), and Counts III and VI (Unjust Enrichment) are simply formulaic recitations of these causes of action. Count II and V (Breach of Implied in Fact Contract) aver:

- Plaintiff performed services from which the Corporate Defendants benefitted. (A.C. ¶¶ 71, 97).

- The services plaintiff performed were of a skilled and professional manner. (A.C. ¶¶ 72, 98).

- The Corporate Defendants agreed to pay the price charged by plaintiff. (A.C. ¶¶ 73, 77, 99, 103).

- The Corporate Defendants profited from these services. (A.C. ¶¶ 74, 75, 100, and 101).

-The Corporate Defendants knew that plaintiff expected to be paid for the services (A.C. ¶ ¶ 76 and 102).

- Plaintiff's prices were reasonable. (A.C. ¶ ¶ 72 and 98).

These allegations are conclusory factual allegations devoid of any reference to actual events. Therefore, Counts II and V should be dismissed for failure to meet the minimum notice pleading standards of Fed. R. Civ. P. 8(a)(2).

Counts III and VI for Unjust Enrichment are similarly devoid of fact.  These counts allege that:

- Plaintiff provided services of good and marketable quality at a fair price. (A.C. ¶ ¶ 82, 108)

- The Corporate Defendants utilized and profited from plaintiff's services. (A.C. ¶ ¶ 83, 84, 85, 109, 110)

- The Corporate Defendants benefitted and were enriched by plaintiff's services. (A. C. ¶ ¶ 86, 112).

As plaintiff has failed to ground the above legal conclusions in a sufficiently plausible factual basis, both unjust enrichment claims (Counts III and VI) should be dismissed pursuant to Twombly and Iqbal, supra.  In short, Counts II, III, V, and VI, should be dismissed.

### 2.    Counts against Koos

Plaintiff has sought to ensnare Koos in this litigation by asserting in Count VII the  participation theory and newly minted Count VIII which is labeled, "Pierce Corporate Veils of Entest & Bio-Matrix".  These counts, discussed in turn,

10

are also insufficient to survive defendants' 12(b)(6) Motion.  Officers "are not held liable for the corporation's breach of a contract absent an establishment of participation theory or the successful assertion of the equitable doctrine of piercing the corporate veil." First Realvest, Inc. v. Avery Builders, Inc., 600 A.2d 601, 603 (Pa. Super. Ct. 1991).  "[T]he breach of the contract is the breach of a promise made by the corporation, and not the breach of any promise extended by the corporate officer." Loeffler v. McShane, 539 A.2d 876, 879 (Pa. Super. Ct. 1988). Thus, "only the corporation may ordinarily be held liable for contract damages." Id.

### a.    Participation Theory-Count VII

In order to determine whether, under Fed. R. Civ. P. 8(a), the plaintiff has sufficiently stated a claim under the participation theory, one must first determine the elements of the claim.  The Pennsylvania Supreme Court has recognized the participation theory of liability:

> The general, if not universal, rule is that an officer of a
> corporation who takes part in the **commission of a tort
> by the corporation** is personally liable therefore.

Wicks v. Milzoco Builders, Inc., 470 A.2d 86, 90 (Pa. 1983) (citations omitted) (emphasis added); see also Peerless Heater Co. v. Mestek, Inc., 2000 WL 637082, *11 (E.D.Pa. May 11, 2000) ("The touchstone for personal liability [pursuant to the participation theory] under Pennsylvania case law, therefore, is knowing

11

participation in the tortious conduct.").

There are <u>no</u> facts in the Amended Complaint that serve as a basis for an underlying tort action against the Corporate Defendants nor has plaintiff brought a tort action against the Corporate Defendants. Plaintiff's only references to a tort are the conclusory statements relating to the behavior of Koos not the Corporate Defendants. For instance, plaintiff makes the threadbare assertion that "Koos personally participated in the tortuous and unlawful conduct subject of this Complaint." A.C. ¶ ¶ 15, 118. Plaintiff has failed to allege any facts suggesting that the Corporate Defendants participated in any tort.

In fact, under Pennsylvania law, the economic loss doctrine and the gist of the action doctrine prevents the plaintiff from bringing any tort action against the Corporate Defendants. The "gist of the action" doctrine bars parties from bringing a tort claim that merely replicates a claim for breach of an underlying contract. <u>Phico Insurance Co. v. Presbyterian Medical Services Corp.</u>, 663 A.2d 753, 757 (Pa. Super. Ct. 1995). Pennsylvania's economic loss doctrine holds that tort theories "do not apply to actions between commercial enterprises where the only damages alleged are economic losses." <u>Blue Mountain Mushroom Company v. Monterey Mushroom, Inc.</u>, 246 F. Supp.2d 394, 402 (E.D. Pa. 2002) (citation omitted).. Economic losses are those losses that are neither physical injuries nor damages to tangible property. <u>Rock v. Voshell,</u> 397 F.Supp.2d 616, 627 (E.D.Pa.

2005) (citing <u>2-J Corp. v. E. Tice</u>, 126 F.3d 539, 541 (3d Cir. 1997)).  As this case is solely about alleged monetary losses of plaintiff, any losses plaintiff suffered are economic.  Thus, any tort action plaintiff would attempt to bring against the Corporate Defendants would be impermissible.

Consequently, even if plaintiff had adequately pled the facts constituting an underlying tort committed by the Corporate Defendants, Pennsylvania law would bar such an action both under the gist of the action and the economic loss doctrines.  Thus, there can be no valid participation theory asserted against Koos.

In addition, plaintiff's averments concerning Koos's involvement in the matter are inadequate to maintain the participation theory count.  In Count VII, plaintiff avers that Koos "knew of the obligations of Bio-Matrix Agreement and Entest and knowingly caused/allowed Bio-Matrix and Entest to engage in the unlawful conduct subject of this Complaint and causing harm to the plaintiff," Paragraph 117, and "Koos personally participated in the tortuous and unlawful conduct subject of this Complaint".  Paragraph 118.  These statements fail to identify any real world events, and simply attempt to recite the elements of a cause of action.  They do not put Koos on notice on what exactly he did and thus should be dismissed pursuant to <u>Twombly</u> and <u>Iquac, supra.</u>

b.    <u>Pierce Corporate Veils-Count VIII</u>

An attempt to pierce the corporate veil is not itself a cause of action, but

rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract. <u>Siematic Mobelwerke Gmbh & Co. Kg v. Siematic Corporation</u>, 643 F.Supp.2d 675, 694 (E.D. Pa. 2009).   Plaintiff's averments concerning piercing the corporate veil of the Corporate Defendants resulting in personal liability to Koos are legally insufficient to meet the federal pleading standards and do not set forth a substantive cause of action.   The averments concerning piercing the corporate veil are as follows:

- Koos is a shareholder, President, Chief Executive and Chairman of the Board of both Corporate Defendants. (A.C. ¶ 9).

- "Koos' relationship' with Entest and Bio-Matrix is both expansive and fluid and that he holds/held or purports to hold/have held various offices or titles with these companies . . . ." (A.C. ¶  10).

- Koos dominates and controls the controls the Corporate Defendants to such an extent that these companies are merely his alter ego. (A.C. ¶ ¶ 11, 121).

- The affairs of the Corporate Defendants and Koos are intertwined to the extent that the veils of the Corporate Defendants must be pierced. (A.C. ¶ 12).

- The written contracts provide that notice is to be sent to Koos' attention.

- Plaintiff only dealt with Koos. (A.C. ¶ 14).

- Koos caused the Corporate Defendants to enter into the written agreements with plaintiff.  (A.C. ¶  16).

These averments, even if true, are not sufficient to pierce the corporate veil.

Under Pennsylvania law, courts may only pierce the corporate veil in limited

circumstances. <u>Pearson v. Component Technology Corp.</u>, 247 F.3d 471 (3d Cir.

2001). Equity must demand that the corporate form be disregarded. <u>Id.</u> The

factors to be considered are:

> (1) gross undercapitalization;
> (2) failure to observe corporate formalities;
> (3) substantial mingling of corporate and personal affairs, and
> (4) using the corporate form to perpetrate a fraud.

<u>Lumax Industries, Inc. v. Aultman</u>, 669 A.2d 893, 895 (Pa. 1995). While these

factors are not exhaustive nor must each one be proven, the overall circumstances

must be of injustice or fundamental unfairness. <u>Trustees, Nat. Elevator Indus.</u>

<u>Pension v. Lutyk</u>, 332 F.3d 188, 194 (3d Cir. 2003). Plaintiff's averments

concerning piercing the corporate veil miss their mark. They do not address any of

the above-listed factors nor do they establish any potential injustice or unfairness

in limiting plaintiff's ability to seek payment, if it is successful, only from the

Corporate Defendants. When a party has failed to allege facts sufficient that

would, if proven, allow the corporate to pierce the corporation's veil, the party's

claims regarding piercing the corporate veil should be dismissed on 12(b)(6)

motion. <u>See</u> <u>Trevino v. Merscorp, Inc.</u>, 583 F. Supp.2d 521, 528-531 (D. Del.

2008). In this case, plaintiff has failed to aver the requisite facts necessary to

pierce the corporate veil and an underlying substantive cause of action to which the

corporate veil should be pierced. Hence, the Count VIII should be dismissed.

**D.**     **THE PLAINTIFF'S CLAIMS FOR ATTORNEYS FEES AND PUNITIVE DAMAGES SHOULD BE STRICKEN.**

Plaintiff at all counts of its Amended Complaint requests an award of reasonable attorneys fees.  In Pennsylvania it is well settled that attorney fees may not be awarded in an action absent an express statutory right to attorney fees or a contract providing for fees between the parties.  The Pennsylvania Supreme Court has explained:

> The general rule within this Commonwealth is that each side is responsible for the payment of its own costs and counsel fees absent bad faith or vexatious conduct. This so-called "American Rule" holds true unless there is express statutory authorization, a clear agreement of the parties or some other established exception.

McMullen v. Kutz, 985 A.2d 769, 775 (Pa. 2009) (citations and quotations omitted.)   No statute or contractual provision exists between the parties to permit the prayer for attorney fees.  Plaintiff in its Amended Complaint cites Section 6(b) of the written agreements between the parties for the provision of attorneys fees. This section of the written agreement states:

> Except as may be otherwise provided in this Agreement, such breach by either party will result in the other party being responsible to reimburse the nondefaulting party for all costs incurred directly as a result of the breach of this Agreement; and shall be subject to such damage as may be allowed by law including all attorneys' fees and costs of enforcing this Agreement.

16

(Emphasis added.)  As the phrase "as may be allowed by law" modifies the term attorneys fees, the plain meaning of the above provision is that a prevailing party may only obtain attorneys fees when this is allowed by law.  In Curlett Family Limited Partnership, Ltd. v. Particle Drilling Technologies, Inc., 254 Fed. Appx. 320, 2007 WL 3340845 (5th Cir. 2007), the Fifth Circuit analyzed a similar provision in a settlement agreement, which provided:

> the prevailing party or parties in the subsequent litigations shall be entitled to recover as allowed by law or contract, reasonable attorneys' fees and expenses, including unsuccessful medication.

Id. at 329 (emphasis added).  The Fifth Circuit found that in order for a party to be entitled for attorneys fees, the "allowed by law or contract" language mandated that a separate law or contract provide for attorneys fees.  Id.  It reasoned that if the parties wanted an affirmative authorization to recover attorneys fees, "they could have done so by leaving out the qualifying clause, "as allowed by law or contract".  Id.  Applying this reasoning to the case at hand, the written agreements at issue do not by themselves provide for attorneys fees.  As there is no other Pennsylvania law that provides for these fees, plaintiff is not entitled to such fees even if it is the prevailing party.

Plaintiff further requests an award of punitive damages at all counts of its Complaint.  It is well settled that punitive damages may not be awarded in a contract action.  Thorsen v. Iron & Glass Bank, 476 A.2d 928, 932 (Pa. Super. Ct.

1984); <u>Standard Pipeline Coating Co. v. Solomon & Teslovich, Inc.</u>, 496 A.2d 840, 844 (Pa. Super. Ct. 1985). To the extent plaintiff has otherwise pled any claim for punitive damages, plaintiff has failed to aver sufficient facts or actions to justify any such award as a matter of law. Thus, the request for attorneys fees and punitive damages should be stricken from Counts I and IV.  In addition, if the Court does not dismiss Counts II, III, V, VI, and VII, then the request for attorneys fees and punitive damages in these counts should be stricken.

## V.   Conclusion

For the reasons stated above, Defendants respectfully request that Counts II, III, V, VI, VII, and VIII  be dismissed and the claims for attorneys fees and punitive damages relating to Counts I and IV be stricken.   In the alternative, Defendants respectfully request that Plaintiff's claims for attorneys' fees and punitive damages in all counts should be stricken.

Respectfully submitted,

/s/ _____
Elizabeth J. Goldstein, Esquire
Attorney I.D. No.
egoldstein@dilworthlaw.com
Victor P. Stabile, Esquire
Attorney I.D. No. 37449
vstabile@dilworthlaw.com
John B. Consevage, Esquire
Attorney I.D. No. 36593
jconsevage@dilworthlaw.com
Dilworth Paxson LLP
112 Market Street, 8th Floor
Harrisburg, PA  17101
(717) 236-4812 (phone)
(717) 236-7811 (fax)
*Attorneys for Defendants*

Dated:      May 16, 2011

**Unpublished Cases**

Westlaw.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))**

C This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007.   See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4.  (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
CURLETT FAMILY LIMITED PARTNERSHIP,
LTD., Plaintiff-Appellant
v.
PARTICLE DRILLING TECHNOLOGIES, INC., a
Delaware Corporation; Particle Drilling Technologies, Inc., a Nevada Corporation, Defendants-Appellees.

No. 06-20600.
Nov. 9, 2007.

**Background:** Assignor of patented drilling technology sued assignee, seeking declaration of its rights under parties' license and settlement agreements and damages. Assignee filed counterclaim for declaratory relief under same agreements. The United States District Court for the Southern District of Texas granted partial summary judgment for assignee and awarded it attorney fees. Assignor appealed.

**Holdings:** The Court of Appeals, Garwood, Circuit Judge, held that:
(1) settlement agreement unambiguously terminated each party's license rights to all improvements to technology created by other party;
(2) interpreting settlement agreement to require termination of party's license rights to improvements was reasonable; and
(3) settlement agreement's fee provision did not support award of fees to assignee.

Affirmed in part and reversed in part.

West Headnotes

[1] Compromise and Settlement 89 ⟨⟩11

89 Compromise and Settlement
    89I In General
        89k10 Construction of Agreement
            89k11 k. In General. Most Cited Cases

Under Texas law, settlement agreement dictating parties' amendment of exclusive license agreement for patented drilling technology unambiguously terminated each party's license rights to all improvements to technology created by other party when agreement indicated that parties did not surrender "their license rights in and to improvements of the Licensed Patents through the date of closing hereof" and that, thereafter, "neither party shall have license rights in and to the other party's improvements of the Licensed Patents," notwithstanding one party's contention that settlement agreement preserved license rights to improvements created by other party before closing date.

[2] Compromise and Settlement 89 ⟨⟩11

89 Compromise and Settlement
    89I In General
        89k10 Construction of Agreement
            89k11 k. In General. Most Cited Cases

Interpretation of provisions of settlement agreement that dictated parties' amendment of exclusive license agreement for patented drilling technology as requiring termination of each party's license rights to all improvements to technology created by other party was reasonable under Texas law, given absence of showing that such improvements actually existed and were used or intended to be used by licensee, licensee's failure to calculate damages based on any loss of revenue stemming from surrender of license rights to improvements, and licensee's release of its claims arising under license agreement prior to settlement's closing date.

[3] Federal Courts 170B ⟨⟩616

170B Federal Courts
    170BVIII Courts of Appeals

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))**

170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
170BVIII(D)1 Issues and Questions in Lower Court
170Bk616 k. Grounds of Defense. Most Cited Cases

Party to settlement agreement could not argue, for first time on appeal from district court's interpretation of agreement, that agreement was ambiguous.

**[4] Costs 102 ☞194.48**

102 Costs
102VIII Attorney Fees
102k194.48 k. On Dismissal, Nonsuit, Default, or Settlement. Most Cited Cases

Provision in settlement agreement allowing for recovery of attorney fees in subsequent litigation "as allowed by law or contract" permitted recovery of fees if they were authorized by some law or other contract, and thus did not provide basis for award of attorney fees under Texas law in the absence of fee provision in parties' earlier contracts.

**\*321** John C. Butters, Richard Gardner Wilson, McFall, Sherwood & Breitbeil, Houston, TX, for Plaintiff-Appellant.

John Lee Dagley, Campbell, Harrison & Dagley, Justin M. Campbell, III Houston, TX, for Defendants-Appellees.

Appeal from the United States District Court for the Southern District of Texas, 4:06-CV-1012.

Before GARWOOD, JOLLY, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge: FN*

FN* Pursuant to 5th CIR. R. 47.5 the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th CIR. R. 47.5.4.

**\*\*1** Plaintiff-appellant, Curlett Family Limited Partnership, Ltd. ("CFLP"), appeals the district

court's June 15, 2006 and June 26, 2006 orders granting the motion of the defendant-appellees, Particle Drilling Technologies, Inc., a Delaware Corporation and Particle Drilling Technologies, Inc., a Nevada Corporation (together "PDTI"), for partial summary judgment and awarding PDTI attorneys' fees. For the following reasons, we affirm the order granting partial summary judgment and reverse the order awarding attorneys' fees.

**\*322 FACTS AND PROCEEDINGS BELOW**
Harry B. Curlett, the General Manager of CFLP, invented and patented "PID Technology," a method for rapidly drilling well bores in the Earth. On June 1, 2003, CFLP and PDTI executed an Assignment and Assumption Agreement that provided PDTI the exclusive right to use the assigned PID Technology for all applications. On that same day, the parties executed an Exclusive License Agreement ("License Agreement") in which PDTI licensed the non-oil and gas applications of the PID Technology back to CFLP.FN1 The result of these two agreements is that PDTI retained the exclusive right to use the PID Technology and its improvements for only oil and gas purposes and CFLP had the right to use PID Technology for all other purposes.

FN1. PDTI is the successor organization to Prodril Acquisition Company, the party that entered the Assignment and Assumption Agreement and the License Agreement with CFLP.

In November of 2004, PDTI filed suit against CFLP in the 333rd Judicial District Court of Harris County, Texas. In this suit, PDTI sought to terminate the License Agreement with CFLP because of alleged fraud committed by CFLP and Harry Curlett. The parties agreed to mediate that dispute, and on February 8, 2006, the parties entered into a Confidential Binding Settlement Agreement ("Settlement Agreement"). The Settlement Agreement required the parties to make a number of amendments to the License Agreement and to release any claims, demands, or suits relating to the License Agreement up to that date. Pursuant to the Settlement Agreement, PDTI and CFLP executed a mutual release of all their claims against each other and moved for the case to be dismissed. FN2

FN2. On February 21, 2006, the state court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))**

signed an order granting the parties motion and dismissed all claims with prejudice.

Following the settlement, CFLP submitted a preliminary draft of the amended License Agreement to PDTI, which substituted PDTI's name for its predecessor's name and added language to Sections 5.1 and 5.2 that would indefinitely grant both parties license rights to improvements made by the other party on or before February 17, 2006. PDTI claimed that CFLP's draft was an erroneous interpretation of the Settlement Agreement, so it submitted its own version of the amended License Agreement to CFLP, which deleted Sections 3, 5.1, and 5.2 and inserted its name in place of its predecessor.

On March 16 and 20, the parties consulted with a mediator in an attempt to resolve their differences regarding the amending of the License Agreement. On March 24, 2006, after the parties were unable to resolve their differences, CFLP filed this lawsuit seeking a declaration of its rights under the Settlement and License Agreements and damages of $26,000,000 per month. PDTI counterclaimed for declaratory relief under the same agreements. On April 19, 2006, CFLP filed a motion for summary judgment; PDTI then cross-motioned for summary judgment.

**\*\*2** The district court granted PDTI's motion for summary judgment by memorandum opinion and order on June 15, 2006. On July 26, 2006, the district court entered a final judgment for PDTI and granted its motion for attorneys' fees in the amount of $26,525. The district court's order adjudged that: CFLP take nothing on its claim for damages; PDTI recover all taxable costs from CFLP; after February, 17, 2006, CFLP has no license to improvements made by PDTI whenever they were **\*323** made; PDTI had no further obligation to share or disclose information with CFLP that was not in the public domain, unless it was required to do so by the license agreement as amended by the Settlement Agreement; and PDTI was to recover attorneys' fees and expenses. CFLP filed a timely appeal from the district court's ruling.

## DISCUSSION

### *I. Jurisdiction*

The district court's jurisdiction was based on diversity of citizenship under 28 U.S.C. § 1332. We

have jurisdiction over this appeal under 28 U.S.C. § 1291.

### *II. Contract Interpretation*

### *A. Standard of Review*

We review *de novo* the district court's instant ruling granting summary judgment because contractual interpretation is a purely legal issue. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir.2004).

### *B. Interpreting Unnumbered Paragraph Five*

[1] Paragraph seven of the Settlement Agreement states that the contract shall be construed under Texas law. Under Texas law, if a contract is worded so that it can be given a definite legal meaning, it is not ambiguous and its construction is a matter of law. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). The interpretation of a contract must be decided by looking at the document "as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996). A contract is considered from its entire context and all provisions are given effect "so that none will be rendered meaningless." *Coker*, 650 S.W.2d at 393.

The paragraph at the center of this dispute, unnumbered paragraph five of Section One of the Settlement Agreement ("the Paragraph"), reads as follows:

"Particle Drilling Technologies, Inc. and Curlett Family Limited Partnership, Ltd. hereby amend the Exclusive License Agreement between them dated June 1, 2003, to remove Sections 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 5.1 and 5.2 therefrom **(Sentence One)**. These deletions shall not eliminate Particle's obligation to provide documents and information which is in the public domain to CFLP **(Sentence Two)**. It is the limited intention of the parties that, by such deletions, there will be no further sharing of information regarding improvements and other information among them as except as set forth herein **(Sentence Three)**. It is not the intent of the parties, by such deletions, that the parties surrender or give up, and the parties do not surrender or give up, their license rights in and to improvements of the Licensed Patents through the date of closing hereof, February 17, 2006 **(Sentence Four)**.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))

Thereafter, neither party shall have license rights in and to the other party's improvements of the Licensed Patents (**Sentence Five**). The parties shall amend the exclusive License Agreement to reflect these amendments within thirty (30) days from February 8, 2006 (**Sentence Six**)." [FN3]

FN3. Sentence designations are added for ease of reference.

**\*\*3** Below, CFLP and PDTI each argued that theirs was the only reasonable and unambiguous interpretation of the Settlement Agreement. Under both CFLP's and PDTI's interpretation of the Paragraph, neither party has a right to improvements made by the other party to **\*324** the PID Technology after the closing date of the Settlement Agreement, February 17, 2006. The question presented in this case is whether the Paragraph terminates license rights to improvements created prior to February 17, 2006. The district court accepted PDTI's interpretation, which, on the closing date, terminates license rights to all improvements created by the other party. CFLP believes that the Settlement Agreement preserves license rights to improvements created by the other party before the closing date. This question is addressed by Sentences Four and Five of the Paragraph.

Sentence Four states that: "It is not the intent of the parties, by such deletions, that the parties surrender or give up ... their license rights in and to improvements of the Licensed Patents through the date of closing...." This sentence means that the deletion of Sections 5.1 and 5.2 did not surrender the parties' rights to improvements. If and when the parties were to surrender their rights to improvements turns of the interpretation of the clause, "through the date of the closing." [FN4] CFLP argues that "through the date of closing," modifies the phrase, "improvements of the Licensed Patents," rather than the phrase, "do not surrender or give up their license rights." The effect of this interpretation would be that the parties would never surrender license rights to improvements made on or before the date of closing. Under the district court's interpretation of the Settlement Agreement, the clause, "through the date of the closing," modified the phrase, "do not surrender or give up their license rights." [FN5] The effect of this interpretation would be that the license rights to improvements are not given up until the closing date. [FN6]

FN4. When used in relation to a specific date, "through" is defined as follows: "[U]p to and including: *The play runs through May.*" AMERICAN HERITAGE DICTIONARY 1413 (3d ed.1997).

FN5. The district court adopted this interpretation of the Paragraph when it granted PDTI's cross motion for summary judgment, which advocated this reading of the Settlement Agreement.

FN6. Although page seven of the district court's opinion contains language suggesting that the Settlement Agreement terminated CFLP's entire license to the PID Technology, we believe that this wording was an unintentional misstatement. The district court's order makes it clear that, under its reading of the Settlement Agreement, only the license rights to improvements were terminated, so we do not rule that the district court adjudicated anything beyond its order.

CFLP's interpretation has some force if the sentence is read in isolation. However, when interpreting a contract, we must look at the document as a whole. See *Columbia Gas Transmission Corp.,* 940 S.W.2d at 589. In order to interpret the Settlement Agreement as CFLP urges, we would have to view Sentence Four as creating a distinction between improvements created "through the date of closing" and improvements created after that date. The former would be protected by Sentence Four and the later presumably would be extinguished by Sentence Five. Sentence Five, however, does not recognize any distinction between improvements. Sentence Five states that after the closing date, "neither party will have license rights in and to the other party's improvements." There is no qualifying term limiting this surrender of license rights only to those improvements created after the closing date or excepting those improvements made up to and including the closing date. Therefore, we will not read such a distinction into the Settlement Agreement.

**\*\*4** Comparing how Sentences Four and Five modify the improvements sharing obligation**\*325** with how Sentences Three and Four modify the disclosure obligation also supports PDTI's contention that Sentence Five completely terminates license

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))**

rights to improvements after February 17, 2006. Sentence Two requires that PDTI continue to provide CFLP with documents and information that are in the public domain even though the deletion of Section 3 terminated its other disclosure obligations. Sentence Three reinforces this point by stating that the deletion of Section 3 means that there will no longer be an obligation for the parties to share information, "except as set forth herein" (referencing Sentence Two's requirement to disclose public information).

Contrast this with Sentences Four and Five. Under CFLP's interpretation, Sentence Four preserves the limited right to continue using improvements made on or before the closing date. This is analogous to Sentence Two's retention of PDTI's obligation to share public information with CFLP. Sentence Five then states that after the closing date neither party has a license to the improvements made by the other party. This is analogous to Sentence Three's termination of the obligation to share information. Sentence Five, however, does not have language indicating that the termination of the parties' license rights to improvements is limited by an exception created in Sentence Four. If Sentence Four was meant to carve out an exception to the general termination of the parties' license rights to improvements, the drafters likely would have included language recognizing the exception as they did in Sentence Three. The absence of language recognizing an exception indicates that CFLP's interpretation of the Paragraph is incorrect. Additionally, the absence of such qualifying language supports the district court's interpretation of the Paragraph because under its interpretation, Sentence Four only maintains license rights to improvements until the closing date. Consequently, there was no need for qualifying language in Sentence Five because after the closing date the license rights to all past, present, and future improvements were terminated.

Finally, CFLP's interpretation of Sentence Five would render it meaningless. Sentence One deleted Sections 5.1 and 5.2 from the License Agreement; those sections provided reciprocal license rights to any improvements to the PID Technology made by the other party. Once Sentence One deleted these sections from the Licensing Agreement there were no future rights to improvements. If Sentence Five was only meant to terminate future license rights to improvements, it becomes redundant because the deletion of Sections 5.1 and 5.2 accomplished that. Given

the rule of construction that no contract provision should be read to be meaningless, this interpretation of the contract is disfavored. *Coker,* 650 S.W.2d at 393. The district court's interpretation avoids this redundancy because it reads Sentence Five as terminating all license rights to PID Technology improvements, past, present, and future, which goes further than the deletion of Section 5.1 and 5.2 in Sentence One.[FN7]

FN7. CFLP also argues Section 5.1 of the License Agreement automatically designates any improvements to the PID Technology created by PDTI as an Invention and thus a part of their license. If this were the case, no license rights to improvements created before the closing date can be taken away because they are part of CFLP's license under Section 2. We disagree with CFLP's interpretation of that section. The relevant portion of Section 5.1 of the License Agreement reads as follows:

"PRODRIL ACQUISITION COMPANY shall retain all rights and title in any such improvements including the right to file patent applications therefor and have letters patent issued in its own name in all countries; provided, however, any new inventions resulting from such improvements shall automatically constitute, and be treated as, an Invention for purposes of this Agreement, effective as of the date of inception of such improvements, and any patent application and patent issued therefor embodying in any of its claims such improvements shall automatically constitute, and be treated as, a[sic] Licensed Patents, effective as of the date of filing of such patent application, without the necessity for amendment of this Agreement."

The term Invention is defined as follows: " 'Inventions' means the inventions embodied in the Licensed Patents and two (2) invention disclosures for 'Injector Systems' and 'PID Drill Bit (Nozzle only)' assigned to PRODRIL ACQUISITION COMPANY under the Assignment and Assumption Agreement."

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))

This paragraph says that "any new inventions resulting from such improvements shall automatically constitute ... an Invention...." However, the word "inventions" is never defined in the contract, and the defined term "Inventions" does not help determine which improvements should be "inventions." When an improvement becomes an "invention" is critical because only those improvements that are "inventions" automatically become an "Invention" and thus a part of CFLP's license. Therefore, the plain language of 5.1 does not support CFLP's assertion that all improvements are "inventions," so we reject its argument that all improvements made by PDTI on or before the closing date are a part of CFLP's license under Section 2.

*326 **5 For the foregoing reasons, we believe that the district court's interpretation of the Settlement Agreement is the only reasonable interpretation, and we affirm its grant of PDTI's motion for summary judgment.

*C. Was the District Court's Interpretation of the Contract Unreasonable?*

[2] Having concluded that the contested paragraph unambiguously terminates both parties' license rights to all improvements to the PID Technology, we now turn to CFLP's contention that this interpretation is unreasonable.

Under Texas law, an agreement must be interpreted reasonably according to the intention of the parties at the time it was entered. *Portland Gasoline Co. v. Superior Mktg. Co.,* 150 Tex. 533, 243 S.W.2d 823, 824 (1951). "The primary goal is to ascertain and give effect to the parties' intent as expressed in the contract." *Gulf Ins. Co. v. Burns Motors, Inc.,* 22 S.W.3d 417, 423 (Tex.2000).

CFLP asserts that it is unreasonable to believe that it would have intended to give up its rights to the improvements PDTI made to the PID Technology before February 17, 2006. An unstated, underlying premise of this argument is that there actually were improvements to the PID Technology created after June 1, 2003 by PDTI before February 17, 2006 that CFLP knew about and was using or intended to use.

If there are no such improvements, then interpreting the Settlement Agreement as terminating all license rights to improvements made up to February 17, 2006 would not be unreasonable because it would only require CFLP to give up something it did not have to begin with. The record does not contain any allegations (or any summary judgment evidence) that CFLP uses any improvements made by PDTI to the PID Technology in its business or that it has ever even been made aware that any such post June 1, 2003 improvements existed on or before February 17, 2006.[FN8] In the damages portion of its complaint, CFLP does not calculate damages based on the revenue it *327 would lose if it were required to surrender its license rights to improvements. CFLP calculated damages by estimating the loss it would incur if one of its geothermal wells were delayed in getting into production, but CFLP has not alleged that any shutdown would be caused by its inability to use improvements made by PDTI to the PID Technology after June 1, 2003 and on or before the closing date.

FN8. CFLP filed an injunction in this case trying to stop PDTI from publicly disclosing information about improvements made to the drill bit, the shot trap, and the new injector system, but it never alleged that these improvements were created on or before the closing date.

Additionally, CFLP's assertion that the Settlement Agreement allows it to retain license rights to any improvements made by PDTI on or before the closing date is inconsistent with the fact that it gave up any claims for damages that it would have had against PDTI for prior violations of its rights under License Agreement. By signing the Settlement Agreement, CFLP pledged to surrender any and all claims it asserted *or could have* asserted against PDTI under the License Agreement up to February 17, 2006.[FN9] So while CFLP claims that the Settlement Agreement retained its license rights to PDTI's improvements made after June 1, 2003 and on or before February 17, 2006, it had, because of the February 17, 2006 state court order, lost its ability to sue for damages if PDTI did not comply or had not complied with that directive.[FN10]

FN9. On February 17, 2006, the state court ordered that "all claims asserted or that could have been asserted by Harry B. Cur-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))**

lett, Deep Heat Energy Corporation, Curlett Family Limited Partnership, Ltd., and CCore Technology and Licensing, Ltd., jointly and severally, against Particle Drilling Technologies, Inc. are DISMISSED WITH PREJUDICE, with each party bearing its own costs and attorney's fees." *Particle Drilling Technologies, Inc. v. Curlett,* No.2004-63506 (333rd Dist. Ct., Harris County, Tex. Feb. 17, 2006).

FN10. CFLP also claims that the district court erred in interpreting the Settlement Agreement because it is unreasonable to think that it intended to amend the License Agreement simply "to preserve a meaningless right that would, by then, have expired." But it is not unreasonable to believe that the parties would have wanted to amend the License Agreement to create on fully integrated document describing the parties' relationship.

**\*6** For these reasons, we conclude that the district court's interpretation of the paragraph is the more natural reading of it and that it is the most reasonable reflection of the parties' objective intent. Therefore, we hold that the district court's grant of summary judgment to PDTI should be affirmed. FN11

FN11. We note in passing that the district court's statement in its June 15, 2006 opinion that after February 17, 2006 "the parties manifested an intent to relinquish any previously existing rights to the use of the *PID Technology* and its improvements" (emphasis added)-citing the language in Sentence Five that "[t]hereafter, neither party shall have license rights in and to the other party's improvements of the Licensed Patents"-appears to be an inadvertent error insofar as it includes "PID Technology" rather than simply "improvements" thereto. We note the July 26, 2006 final judgment does not include this apparently inadvertent overbreadth in the language of the June 15 opinion. It is the judgment that controls in this respect.

### III. Ambiguity
[3] Additionally, CFLP briefly argues, for the

first time on this appeal, that even if the district court's construction was the most reasonable, summary judgment was improper because the meaning of the Paragraph is ambiguous.

Under our decisions, an argument not raised before the district court cannot be asserted for the first time on appeal. *Stokes v. Emerson Elec. Co.,* 217 F.3d 353, 358 n. 19 (5th Cir.2000). In order to preserve an argument for appeal, the argument "must be raised to such a degree that the trial court may rule on it." *Matter of Fairchild Aircraft Corp.,* 6 F.3d 1119, 1128 (5th Cir.1993). *See also* **\*328***O'Kehie v. Harris Leasing Co.,* 80 S.W.3d 316, 319 (Tex.App.-Texarkana 2002, no pet.) ("Generally, one seeking to establish ambiguity in a written contract must plead it.") (citing *Crozier v. Horne Children Maint. & Educ. Trust,* 597 S.W.2d 418 (Tex.Civ.App.-San Antonio 1980, writ ref'd n.r.e.)).

After a thorough review of the record, we have not found, nor has CFLP brought to our attention, FN12 any indication that CFLP in anyway raised this argument in the district court in any of its pleadings or at any hearing or otherwise. FN13 Nor has CFLP identified any dispute about underlying facts or the intent of the parties that would present a fact issue to be submitted to a jury if we were to hold that the contract was ambiguous. *See Constitution State Ins. Co. v. Iso-Tex Inc.,* 61 F.3d 405, 409 (5th Cir.1995) (affirming summary judgment where an appellant "failed to produce any evidence of a patent or latent ambiguity"). Since the argument that the contract was ambiguous was not raised below and CFLP presented no summary judgment evidence showing ambiguity, it may not assert ambiguity now for the first time on appeal and seek an evidentiary trial to determine the meaning of the relevant document which both parties had submitted to the district court for summary judgment decision without even any hint that a full evidentiary trial was desired or that there were any disputed issues of fact to resolve.

FN12. Instead CFLP's reply brief cites a case from the D.C. Circuit to support the proposition that if both parties argue that they present a reasonable interpretation of the contract, ambiguity need not be raised. In that case, however, the *district court held that the contract was ambiguous* and that the appellant need not have argued that the sen-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))

tence was unambiguous below in order to raise that argument on appeal, therefore it is inapplicable to this case. *KiSKA Const. Corp. v. Wash. Metro. Area Transit Auth.,* 321 F.3d 1151, 1163 n. 15 (D.C.Cir.2003).

FN13. In CFLP's response to PDTI's cross-motion for summary judgment, CFLP's sole argument was that the contract was *not* ambiguous and that its interpretation was the only reasonable one. Under Texas law, however, a contract is not ambiguous merely because two parties offer different interpretations. *DeWitt County Elec. Co-op., Inc. v. Parks,* 1 S.W.3d 96, 100 (Tex.1999).

**IV. Attorneys' Fees Award**

*A. Standard of Review*

We review a district court's grant of attorneys' fees for abuse of discretion. *DP Solutions, Inc. v. Rollins, Inc.,* 353 F.3d 421, 433 (5th Cir.2003).

*B. Basis for Attorneys' Fees*

[4] As this is a diversity suit and the granting of attorneys' fees is a matter of substantive law, we look to Texas substantive law to determine whether there was a basis for awarding fees. *Id.* Under Texas law, a party is entitled to attorneys' fees if permitted by statute or contract. *Holland v. Wal-Mart Stores, Inc.,* 1 S.W.3d 91, 95 (Tex.1999) (per curiam).

**7 The district court order did not specify on what basis it awarded attorneys' fees. PDTI, however, concedes that there is no Texas statute that permits it to recover attorneys' fees,[FN14] so we will focus our analysis*329 on whether attorneys' fees are authorized by contract.

FN14. PDTI would not be entitled to attorneys' fees under TEX. CIV. PRAC. & REM.CODE § 38.001 because it did not recover damages for breach of contract. *Mustang Pipeline Co. v. Driver Pipeline Co.,* 134 S.W.3d 195, 201 (Tex.2004). PDTI also may not be awarded fees in federal court under the Texas Declaratory Judgment Act. *Utica Lloyd's of Texas v. Mitchell,* 138 F.3d 208, 210 (5th Cir.1998) (holding that a party may not recover attorneys' fees under the Texas Declaratory Judgment Act in a diversity case because the statute is procedural, not substantive).

The portion of the Settlement Agreement that allegedly authorizes attorneys' fees to be awarded, numbered paragraph six, reads as follows: "Conversely, if the subsequent mediation is unsuccessful, then the prevailing party or parties in the subsequent litigation shall be entitled to recover, as allowed by law or contract, reasonable attorneys' fees and expenses, including the cost of the unsuccessful mediation."[FN15]

FN15. The record provides no evidence that any other provision in any contract between the parties authorizes a court to award attorneys' fees.

The literal reading of the clause, "as allowed by law or contract," is that the recovery of attorneys' fees is permitted on the condition that some law or contract authorizes such fees. PDTI argues that this literal reading of the paragraph would render it meaningless because if the recovery of fees were authorized by another contract, there would be no need to mention it in the Settlement Agreement. We disagree. Any grant of fees in the License Agreement would have only covered disputes arising from that agreement. The Settlement Agreement was a freestanding agreement, which, given the history of the parties' relationship, could also have become the subject of litigation. The language in the Settlement Agreement had meaning because it extended any authorization of attorneys' fees bargained for in the License Agreement to any disputes regarding the Settlement Agreement. The fact that attorneys' fees were not authorized in the License Agreement does not undercut this argument because language regarding fees in the Settlement Agreement was likely meant to preserve the status quo on fees. In this situation, the status quo was that no attorneys' fees were to be awarded. Additionally, if the parties wanted this to be an affirmative authorization to recover attorneys' fees they could have easily done so by leaving out the qualifying clause, "as allowed by law or contract."

The language of the Settlement Agreement does not authorize PDTI to recover attorneys' fees. Since there is no other contract between the parties or ap-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5 (Tex.)))**

plicable Texas statute that provides for attorneys'
fees, there was no basis for PDTI to recover attor-
neys' fees under Texas law. Thus, the district court
erred by awarding attorneys' fees to PDTI, and its
decision in that respect is reversed.

## CONCLUSION

For the foregoing reasons, the district court's
grant of summary judgment is AFFIRMED and its
award of attorneys' fees is REVERSED.

AFFIRMED in part; REVERSED in part.

C.A.5 (Tex.),2007.
Curlett Family Ltd. Partnership, Ltd. v. Particle Drill-
ing Technologies, Inc.
254 Fed.Appx. 320, 2007 WL 3340845 (C.A.5
(Tex.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: 2000 WL 637082 (E.D.Pa.))**

H

United States District Court, E.D. Pennsylvania.
PEERLESS HEATER COMPANY, et al.,
v.
MESTEK, INC., et al.

No. CIV. A. 98-CV-6532.
May 11, 2000.

*MEMORANDUM*

PADOVA.

**\*1** Plaintiffs filed the instant suit against Mestek, Incorporated, John E. Reed, and R. Bruce Dewey alleging violations of various federal antitrust laws and the Massachusetts Unfair Sales Act, Mass.Gen.Laws.Ann. ch. 93 §§ 14E-14K, for attempting to restrict Plaintiffs' nationwide sales of mid-priced, cast iron residential and commercial boilers. The Complaint further asserts claims under Pennsylvania law for defamation, tortious interference with existing and prospective business advantage, and trade libel.

Before the Court is Defendants' Motion for Summary Judgment, Plaintiffs' Motion Pursuant to Rule 56(f), and Plaintiffs' Motion to Strike the Affidavits of Shea and Schwaber. All of the pending Motions are fully briefed and ripe for decision. The Court held oral argument on April 20, 2000. For the reasons that follow, the Court grants in part and denies in part Defendants' Motion, dismisses Plaintiffs' Motion Pursuant to Rule 56(f) as moot, and grants in part and denies in part Plaintiffs' Motion to Strike.

I. Background

Plaintiffs Peerless Heater Company and Peerless Industries, Inc. (collectively "Peerless"), and Defendant Mestek, Incorporated ("Mestek") manufacture and sell cast-iron residential and commercial boilers. Prior to 1992, Peerless owned over 90% of Eafco, Incorporated ("Eafco"), a corporation that operated a foundry ("Eafco Foundry"). Although Peerless and Mestek are competitors in the nationwide boiler market, in 1992, the two companies entered into an agreement by which Mestek and Peerless would become joint owners of Eafco. Under the agreement, both Peerless and Mestek would then obtain their iron boiler castings from the Eafco Foundry. Over the next several years, however, the relationship between Peerless and Mestek deteriorated.

Peerless claims that during the period between 1994 and 1998, Mestek embarked on a campaign to either drive Peerless from the market or takeover Peerless outright. Peerless alleges that Mestek, through its sales representatives, sought to take business away from Peerless by spreading false rumors about Peerless' precarious financial condition and stability. Mestek's representatives further allegedly told customers that Mestek would likely purchase either Peerless itself or Peerless' interest in the Eafco Foundry. In the case of the latter, Peerless claims that Mestek warned customers that Peerless would have to raise its prices to reflect the true costs of production. According to Plaintiffs, Mestek registered the Internet domain name of "Peerlessco.com" to further enhance confusion over Mestek's affiliation with Peerless.

In addition to creating confusion over the affiliation of the two companies, Mestek also allegedly attempted to increase its sales volume by selling boilers at prices below its cost of production to select distributors in New Jersey and Maine. Peerless claims that despite having knowledge of this allegedly predatory conduct, Mestek management deliberately failed to remedy the situation. As a result, the parties ceased their joint ownership of Eafco in 1998.

**\*2** Plaintiffs filed the instant suit on December 15, 1998, against Mestek, John Reed ("Reed"), Mestek's Chairman and Chief Executive Officer, and R. Bruce Dewey ("Dewey"), Mestek's Senior Vice President and General Counsel. The Amended Complaint alleges seven causes of action. Count I states a claim pursuant to Section One of the Sherman Antitrust Act, 15 U.S.C. § 1, for Defendants' alleged dissemination of false and misleading information about Peerless' financial status and future, and affiliation with Mestek. Count II alleges that Defendants engaged in illegal price discrimination and predatory pricing in violation of Section 2(a) of the Clayton Act, as amended by the Robinson Patman Act, 15 U.S.C. § 13(a). Count III asserts that Mestek made misrepresentations to Plaintiffs' potential and existing

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
(Cite as: 2000 WL 637082 (E.D.Pa.))

distributors in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1). Counts IV, V, and VI state claims under Pennsylvania state law for defamation, tortious interference with existing and prospective business advantage, and trade libel respectively. Finally, Count VII alleges that Mestek violated the Massachusetts Unfair Sales Act, Mass.Gen.Laws.Ann. ch. 93 §§ 14E-14K, by selling boilers at prices below its cost of production. Counts III and VII are against Mestek only; Counts I, II, IV, V, and VI are against all Defendants.

II. Plaintiffs' Motion to Strike the Affidavits of Stephen Shea and Steven Schwaber Pursuant to Rule 56(e)

Plaintiffs challenge two affidavits submitted by Defendants in support of their Motion for Summary Judgment as improper under Rule 56(e) of the Federal Rules of Civil Procedure: the affidavits of Stephen Schwaber ("Schwaber"), Vice President of Mestek's Boiler Division, and Stephen Shea ("Shea"), Mestek's Chief Financial Officer. See Def.Ex. 42; Def.Reply Mem.Ex.A. Both affidavits relate to the issue of whether Mestek sold boilers below cost to certain distributors. For the reasons that follow, the Court grants in part and denies in part Plaintiffs' Motion.

A. Legal Standard

Rule 56(e) of the Federal Rules of Civil Procedure states in pertinent part:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

When considering motions for summary judgment, courts interpret Rule 56(e) to preclude consideration of hearsay statements that are not "capable of being admissible at trial." Philbin v. Trans Union Corp., 101 F.3d 957, 961 n. 1 (3d Cir.1996). Furthermore, courts may disregard affidavits submitted in connection with a summary judgment motion when, without a satisfactory explanation, the affidavit con-

tradicts the affiant's earlier deposition testimony. Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir.1991).

B. Discussion

*3 Plaintiffs argue that Schwaber's affidavit should be struck because Defendants failed to attach or serve certified copies of the papers referred to in the affidavit. The Court agrees that Defendants failed to comply with that technical portion of the rule and accordingly strikes Schwaber's affidavit, attached as Exhibit A to Defendants' Reply Memorandum in Support of Motion for Summary Judgment.

Plaintiffs next assert that Shea's affidavit fails to comply with Rule 56(e) because he lacks personal knowledge and is incompetent to testify regarding the subject matter of the affidavit, and because the affidavit presents only conclusions and interpretations of documents that constitute impermissible lay opinion rather than facts. Plaintiffs further argue that Shea's affidavit contradicts his earlier deposition testimony. The Court disagrees with all of Plaintiffs' contentions. As Chief Financial Officer, Shea bears ultimate responsibility for Mestek's financial documents and is therefore competent to explain the contents of those documents. Furthermore, the affidavit affirms his personal knowledge of the matters about which he testifies. Shea's affidavit also contains facts and does not constitute improper lay opinion, nor did Shea contradict his earlier deposition testimony. Accordingly, the Court denies Plaintiffs' Motion with respect to Shea's affidavit.[FN1]

> FN1. The Court notes that Shea's affidavit is not a significant factor in the Court's determination that a genuine issue of material fact exists as to below-cost pricing.

III. Defendants' Motion for Summary Judgment

The Court will address Defendants' summary judgment motion prior to discussing Plaintiffs' Motion Pursuant to Rule 56(f).

A. Legal Standard

It is clear that courts apply the same standard on summary judgment used in all other types of actions to antitrust actions. See Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co., 953 F.Supp. 617, 638 (E.D.Pa.1997). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: 2000 WL 637082 (E.D.Pa.))**

and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial *Celotex* burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

\*4 Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson*, 477 U.S. at 255. "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. *Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1363 (3d Cir.1992).

B. *Discussion*

Defendants request summary judgment on all counts. For the following reasons, the Court grants in part and denies in part Defendants' Motion.

1. *Causation of Injury In Fact*

Defendants first globally argue that Counts I, III, IV, V, and VI fail because Plaintiffs lack evidence demonstrating that Defendants' alleged behavior caused any harm to Peerless. Proof of causation, i.e. that the defendant's conduct caused the injury to the plaintiff, is required in cases arising under Section One of the Sherman Act, the Lanham Act, and Pennsylvania state law claims of tortious interference with business relations, defamation, and trade libel. *See Callahan v. A.E.V., Inc.*, 182 F.3d 237, 250 (3d Cir.1999)(Sherman Act Section One); *AT & T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1428 (3d Cir.1994)(Lanham Act); *Guardian Life Ins. Co. of Am. v. Am. Guardian Life Assurance Co.*, 943 F.Supp. 509, 526 (E.D.Pa.1996)(trade libel); *Centennial School District v. Independence Blue Cross*, 885 F.Supp. 683, 686-88 (E.D.Pa.1994)(defamation and interference with current and prospective business relations). To satisfy this causation requirement, the plaintiff must prove that the defendant's activities were a material cause of the injury, but need not eliminate all possible alternative sources of injury as the cause of its injury. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n. 9. (1969). The plaintiff also need not prove that the defendant's conduct was the sole proximate cause of the injury. *Id.* It is sufficient that the plaintiff "adduce evidence of specific lost transactions showing causation or fact of injury, which is bolstered by an expert damage report that is not overly speculative as a matter of law." *Callahan*, 182 F.3d at 260 (quoting *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 487 (3d Cir.1998)).

Upon a review of the parties' submissions, the Court concludes that Plaintiffs have submitted sufficient evidence from which a jury could reasonably infer causation as to these claims. Plaintiffs present testimony regarding the effects such misstatements have on distributors and customers within the specialized context of the boiler industry, and evidence of decreased sales growth rates involving the distributors who were allegedly exposed to the misstatements. *See* Pl.Ex. 8 at 95-122; Pl.Ex. 14 at 17-18. The Court, therefore, denies Defendants' request for summary judgment on this ground.

2. *Count I: Sherman Antitrust Act Section 1*

\*5 Count I asserts that Defendants disseminated false or misleading information about Peerless' financial condition and stability, the fairness of Peerless'

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
(Cite as: 2000 WL 637082 (E.D.Pa.))

pricing, and the relationship between Mestek and Peerless in violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1 (1994). Plaintiffs allege that Defendants conspired with Mestek's sales representatives to spread these false statements about Peerless among boiler distributors and other customers. Defendants argue that Count I fails because Mestek's sales representatives are not third parties with whom Defendants are capable of conspiring as a matter of law, and nor can Plaintiffs prove that a conspiracy actually existed. Defendants further claim that Plaintiffs have no evidence showing any injury to competition, or to Peerless itself, as a result of the alleged conspiracy.

Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

15 U.S.C. § 1 (1994). Courts construe Section One to proscribe only those combinations or conspiracy that "unduly" restrain trade. Cernuto, Inc. v. United Cabinet Corp., 595 F.2d 164, 166 (3d Cir.1979). In cases such as this where the particular restraint alleged does not fall within a category that has been judicially determined to be illegal per se,[FN2] the court must apply the "rule of reason" test to determine whether the restraint imposed "merely regulates competition or whether it ... may suppress or even destroy competition." Yeager's Fuel, 953 F.Supp. at 656 & n. 9 (quoting Board of Trade v. United States, 246 U.S. 231, 238 (1918) and citing National Society of Professional Engineers v. United States, 435 U.S. 679, 691 (1978)). To present a valid claim under the rule of reason test, a plaintiff must prove that: (1) the defendants contracted, combined, or conspired among each other; (2) the combination or conspiracy produced anticompetitive effects within the relevant product and geographic markets; (3) the objects of and the conduct pursuant to that conspiracy were illegal; and (4) the plaintiff was injured as a result of that conspiracy. Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 275 (3d Cir.1999).

FN2. Courts have held that group boycotts, price fixing, resale price maintenance, tying arrangements and reciprocal dealing constitute per se violations of the Sherman Act.

MHB Distrib. Inc. v. Parker Hannifin Corp., 800 F.Supp. 1265, 1268 (E.D.Pa.1992) (citing Malley-Duff & Assoc. v. Crown Life Ins. Co., 734 F.2d 133, 140 (3d Cir.), cert. denied, 469 U.S. 1072 (1984)). This case does not involve those types of conduct.

To establish the first element, the plaintiff must prove that two or more distinct entities agreed to take action against the plaintiff. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768 (1984)(holding that Section One does not reach conduct that is wholly unilateral); Siegel Transfer Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1131 (3d Cir.1995). Although the express language of the Sherman Act's concerted action requirement could include coordinated conduct among officers or employees of the same company, courts do not interpret the statute in that manner. See Siegel Transfer, 54 F.3d at 1132-34. Rather, courts routinely hold that internal agreements or coordinated conduct among employees, officers, corporate divisions, or subsidiaries to implement the policies of the corporation do not violate the Sherman Act. See Copperweld, 467 U.S. at 769 (holding that a parent corporation and its wholly-owned subsidiary are incapable of conspiring as a matter of law for the purposes of Section One of the Sherman Act); Siegel Transfer, 54 F.3d at 1134 ("A corporation can act only through its agents, thus the acts of corporate directors, officers, and employees on behalf of the corporation are the acts of the corporation and a corporation cannot conspire with itself.")(quoting Tunis Bros. Co. v. Ford Motor Co., 763 F.2d 1482, 1496 n. 21 (3d Cir.), vacated and remanded, 475 U.S. 1105, reinstated, 823 F.2d 49 (3d Cir.), cert. denied, 484 U.S. 1060 (1988)). Under this principle, corporate agents are incapable of engaging in an antitrust conspiracy when they demonstrate a unity of economic interest and purpose with the corporate principal. Siegel Transfer, 54 F.3d at 1134-35. For this reason, courts have held that sales representatives for corporate entities are not third parties with whom the corporation is capable of conspiring where the representatives receive commissions based on the amount of sales they achieve. Id. at 1135 (concluding that the receipt of commissions aligns the economic interests of the corporation and its representatives such that the parties constitute a single economic unit); see also Pink Supply Corp. v. Hiebert, 788 F.2d 1313, 1316-7 (8th Cir.1986).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
(Cite as: 2000 WL 637082 (E.D.Pa.))

*6 Conversely, intra-corporate persons or entities are legally capable of conspiring with the corporation for the purposes of Section One when they act for their own separate and personal interests outside the interests of the corporation. *Siegel Transfer, 54 F.3d at 1134-35; Weiss v. York Hosp., 745 F.2d 786, 813 n. 43, 817 (3d Cir.), cert. denied, 470 U.S. 1060 (1985).* To determine when agents act for personal interests, courts should examine the substance, and not just the form, of the economic relations between the alleged conspirators. *Copperweld, 467 U.S. at 772-73; Siegel Transfer, 54 F.3d at 1132-33.* The substance of the arrangements at issue depends on the economic incentives of the parties involved. *Siegel Transfer, 54 F.3d at 1135.* In cases in which the plaintiff alleges that a defendant corporation conspired with its sales agents or representatives in restraint of trade, courts require that the agent "act to further his own economic interest in a marketplace actor which benefits from the alleged restraint [of trade], and causes his principal to take the anticompetitive actions about which the plaintiff complains." *Id . at 1136-37.* The alleged conspiracy must have brought together the economic power of the corporation and its agents so as to merge their previously divergent interests and goals. *Id. at 1137.*

The Court has examined the parties' submissions and found no evidence that Mestek's sales representatives had personal or economic interests and goals divergent from Mestek.[FN3] Rather, the evidence only confirms that the economic interests of the sales representatives were completely aligned with that of Mestek. Accordingly, the Court concludes that, as a matter of law, Mestek was incapable of engaging in an antitrust conspiracy with its sales representatives and grants summary judgment in favor of Defendants on Count I.[FN4][FN5]

FN3. It is undisputed that Mestek's sales representatives receive commissions in exchange for their sales of Mestek's products. *See* Pl.Br. at 113-114; Pl.Ex. 57 at 3.

FN4. Plaintiffs neither argue nor present evidence that Defendants Reed and Dewey, both officers of Mestek, acted for their own personal interests in this case. There is no genuine issue of material fact, therefore, that Reed and Dewey are not third parties with whom Mestek is capable of conspiring for the purposes of Section One.

FN5. Having disposed of Count I on this ground, the Court declines to address Defendants' other arguments.

*3. Counts II and VII: Robinson Patman Act and Massachusetts Unfair Sales Act*

Counts II and VII of the Amended Complaint allege that Defendants violated Section 2(a) of the Clayton Act as amended by the Robinson-Patman Act, 15 U.S.C. § 13(a) ("Clayton Act"), and the Massachusetts Unfair Sales Act ("Sales Act"), Mass.Gen.Laws Ann.ch. 93 § 14E-14K (West 2000), by selling commercial and residential boilers in various states at prices below the cost of production and only to certain select distributors. Defendants argue that both Counts fail because Plaintiffs lack evidence of below-cost pricing, and are unable to prove Mestek's ability to recoup its investment in below-cost prices.

The Massachusetts Unfair Sales Act is a penal statute applicable to:

[a]ny retailer who, with intent to injure competitors or destroy competition, advertises, offers to sell or sells at retail any item of merchandise at less than cost to the retailer ... or any wholesaler who, with intent as aforesaid, advertises, offers to sell or sells at wholesale any item of merchandise at less than cost to the wholesaler ...

*7 Mass.Gen.Laws.Ann. ch. 93 § 14F (West 2000). Section14G lists exceptions under which retailers and wholesalers may legally sell items below cost. Mass.Gen.Laws.Ann. ch. 93 § 14G (West 2000). Section 14H provides a private right of action under the Sales Act for injunctive relief, but not for damages. *Massachusetts Candy & Tobacco Distrib., Inc. v. Golden Distrib., Ltd., 852 F.Supp. 63, 67-70 (D.Mass.1994); see Mass.Gen.Laws.Ann. ch. 93 § 14H (West 2000).*

Section 2(a) of the Clayton Act prohibits price discrimination "where the effect of such discrimination may be to substantially lessen competition or tend to create a monopoly.[FN6]" 15 U.S.C. § 13(a) (1994); *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc., 159 F.3d 129, 141 (3d Cir.1998).* The essence of a claim under the Clayton

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: 2000 WL 637082 (E.D.Pa.))**

Act is that "[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993).*

FN6. The statute provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a) (1994).

To state a claim under Section 2(a) of the Clayton Act for price discrimination, a plaintiff must prove that the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers, and the effect of such discrimination was to injure competition. *Crossroads Cogeneration, 159 F.3d at 141.* Because the Clayton Act is only a prophylactic statute, it does not require proof that the alleged price discrimination in fact harmed competition. *Stelwagon Manu. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1721 (3d Cir.1995).* Rather, the Clayton Act requires only a "reasonable possibility" of substantial injury to competition to trigger its protections. *Brooke Group, 509 U.S. at 222.*

To prove a reasonable possibility of injury to competition in the absence of direct evidence, the plaintiff must prove both that "the prices complained of are below an appropriate measure of [the defendant's] costs," and that the defendant had a reasonable

prospect of recouping its investment in below-cost prices. *Id. at 222-24; Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1195 n. 3 (3d Cir.1995).* While a necessary element under Section 2(a), evidence of below-cost pricing alone is nonetheless insufficient to allow an inference of recoupment and injury to competition. *Brooke Group, 509 U.S. at 226.*

The United States Supreme Court has outlined two prerequisites for recoupment. *Id. at 225-26; see also Stearns Airport Equip. Co., Inc. v. FMC Corp., 170 F.3d 518, 528 (5th Cir.1999).* First, the defendant's alleged below-cost pricing must have been capable of producing the intended effects on the plaintiff. *Brooke Group, 509 U.S. at 225; Stearns, 170 F.3d at 528.* The threshold inquiry of recoupment, therefore, is whether "given the aggregate losses caused by the below-cost pricing, the intended target would likely succumb." *Brooke Group, 509 U.S. at 225.* "This [analysis] requires an understanding of the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and will." *Id.; see also Stearns, 170 F.3d at 529-30* (requiring plaintiffs to show that the defendants' below-cost pricing is "of a sufficient duration and extent to independently force [the plaintiff] out of the market.")

*8 If the record indicates that the defendant's below-cost pricing could likely produce the intended effect on the target, the second prerequisite is proof that the pricing would likely injure competition in the relevant market. *Brooke Group, 509 U.S. at 225.* To establish this second element of recoupment, the plaintiff must show that "there is a likelihood that the predatory scheme alleged would cause a rise in prices above a competitive level that would be sufficient to compensate for the amounts expended on the predation, including the time value of the money invested in it." *Id.* Determining whether recoupment is likely to injure competition requires an estimate of the cost of the alleged predation, and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market. *Id. at 226.* The plaintiff's case may be terminated on summary judgment in circumstances where market circumstances or deficiencies in proof would preclude a reasonable jury from finding that the alleged scheme would likely result in sustained supracompetitive pricing.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
(Cite as: 2000 WL 637082 (E.D.Pa.))

*Id.; see also Stearns,* 170 F.3d at 529.

Defendants challenge Counts II and VII on several grounds. Defendants first assert that Plaintiffs lack any significant evidence of below-cost pricing.[FN7] The Court determines that Plaintiffs' expert reports, submitted by Dr. Richard Gering, contain sufficient data to raise a genuine issue of material fact regarding the occurrence of below-cost sales.[FN8,FN9] *See* Pl.Ex. 14 at 14-15; Pl.Ex. 62 at Ex. A, Ex. B.

> FN7. Defendants do not challenge Plaintiffs' ability to produce evidence regarding price discrimination.

> FN8. Even had Schwaber's affidavit been considered, the Court would nonetheless conclude that a genuine issue of material fact exists as to the existence of below-cost pricing.

> FN9. Courts have not articulated a clear standard that the jury or the district court should properly apply to determine the measure of the defendant's cost. *See Brooke Group,* 509 U.S. at 223 n. 1 (accepting parties' agreement to use average variable cost); *Advo,* 51 F.3d at 1198 (identifying marginal cost as the proper measure under standard microeconomic theory and average variable cost as a potentially viable proxy for marginal cost). The Court's determination, however, stands under either standard.

Defendants next argue that Plaintiffs lack evidence demonstrating that Mestek had a reasonable prospect of recouping its investment in below-cost prices. Given the *Brooke Group* standard, the Court agrees. Plaintiffs submit no evidence from which a jury could reasonably conclude that Mestek's below-cost pricing could have achieved its intended effect, namely to drive Peerless from the market or eliminate Peerless as a viable competitor.[FN10] To the contrary, the parties' submissions indicate that Peerless' market share, sales, and profits have steadily increased during the relevant period. *See* Def.Ex. 10 at 225; Def.Ex. 13 at 63-64; Def .Ex. 1 at 158-64, 186-190; Pl.Ex. 54. By all accounts, Peerless has become a stronger competitor showing no signs of succumbing to Mestek's allegedly predatory behavior. *Id.* Furthermore, Plaintiffs' expert identifies only approxi-

mately $150,000.00 in damages attributable to Mestek's below-cost pricing. Pl.Ex. 14 at 17. Outside of several conclusory statements in their legal briefs and expert report, Plaintiffs present no contrary evidence showing a reasonable possibility that Peerless could have been driven from the market by Mestek's conduct.[FN11] *See* Pl.Br. at 141; Pl.Ex. 14 at 12, 16. Such unsupported statements alone are insufficient to create a genuine issue of material fact. *See Siegel Transfer,* 54 F.3d at 1138; *Advo,* 51 F.3d at 1198-99.

> FN10. Plaintiffs' position is that Mestek engaged in the below-cost sales scheme and spread malicious rumors about Peerless "to take over or destroy Peerless as a competitor." Pl.Br. at 5; *see also* Pl.Br. at 141.

> FN11. The Court further notes that Plaintiffs' evidence of below-cost pricing involves transactions totaling less than $100,000 .00, and with an aggregate negative margin of only $15,000.00 over a three year period between 1995 and 1998. *See* Pl.Ex. 62 at Exs. A, B. In comparison, Peerless' gross sales in 1999 reached approximately $36 million. Def.Ex. 1 at 159.

*9 In conclusion, the Court determines that the proffered evidence is insufficient to establish a reasonable possibility of success in driving Peerless from the market. *See Stearns,* 170 F.3d at 529-530 (affirming grant of summary judgment in favor of defendant where plaintiff demonstrated underpricing in only five bids out of 240-400 available over a four year period and plaintiff presented no evidence that "its survival was threatened by the sales lost to the rare, sporadic predation that it alleges, and does not claim that the continuation of below-cost bids at [that] level will drive it out of business"); *Taylor Publ'g Co. v. Jostens, Inc.,* 36 F.Supp.2d 360, 369 (E.D.Tex.1999)(finding no reasonable possibility of success where below-cost pricing caused the loss of less than 1% of the plaintiff's sales). Since Plaintiffs are unable to establish an essential prerequisite of recoupment, the Court grants summary judgment in favor of Defendants on Counts II and VII.[FN12]

> FN12. Having resolved Counts II and VII on this ground, the Court declines to consider Defendants' other arguments.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: 2000 WL 637082 (E.D.Pa.))**

4. *Count III: Lanham Act*

Count III states a claim against Mestek under the Lanham Act, 15 U.S.C. § 1125(a)(1), for Mestek's alleged oral statements to distributors and dealers that it would imminently own or currently owns Peerless; that Plaintiffs were financially unstable; and that Peerless price-gouged their customers. Mestek argues that Count III fails as a matter of law because any false statements that were made were not disseminated so as to constitute advertising or promotion within the boiler industry, and were only general comments about Plaintiffs' business and not designed to capitalize on the goodwill associated with Plaintiffs' products.

Section 43(a) of the Lanham Act both proscribes trademark infringement, and generally creates a federal cause of action for unfair competition. *AT & T v. Winback and Conserve Prog., Inc.*, 42 F.3d 1421, 1428 (3d Cir.1994). The statute provides:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1) (1994). Plaintiffs proceed under both sections 1125(a)(1)(A) and (B). Pl.Br. at 155.

Under section 1125(a)(1)(A), the plaintiffs must prove that (1) the defendant made misrepresentations relating to a false designation of affiliation in interstate commerce in connection with goods and services; (2) the misrepresentations are likely to cause confusion, mistake, or deception as to the affiliation of the parties; and (3) the plaintiffs have been or are likely to be damaged. *Winback*, 42 F.3d at 1428. To state a claim under section 1125(a)(1)(B) for false advertising, the plaintiff must prove that (1) the defendant has made false or misleading statements as to his or another's product; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff in terms of declining sales and loss of good will. *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922-23 (3d Cir.1990); *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F.Supp.2d 570, 575 (E.D.Pa.1999).

**\*10** Section 1125(a)(1)(B)'s language regarding "commercial advertising or promotion" describes (1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) designed to influence customers to buy the defendant's products; and (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry. *Synygy*, 51 F.Supp.2d at 576. Some courts have held that section 1125(a)(1)(B) is not designed to apply to oral statements by salespeople to individual customers "concerning matters which an ordinary listener would recognize as personal opinion as opposed to representations of hard definable facts, such as product descriptions." *Licata & Co., Inc. v. Goldberg*, 812 F.Supp. 403, 408 (S.D.N.Y.1993); *see also Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir.1999)('puffery' is not actionable under Lanham Act). Under this principle, only statements of fact capable of being proven false are actionable under the Lanham Act because when personal opinions on nonverifiable matters are given, the recipient is likely to assume only that the communicator believes the statement, not that the statement is true. *Coastal Abstract Serv.*, 173 F.3d at 731; *Licata*, 812 F.Supp. at 408.

Mestek argues that Plaintiffs' claim under section

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: 2000 WL 637082 (E.D.Pa.))**

1125(a)(1)(A) fails because any misrepresentations that Mestek's sales representatives made were not "in connection with any goods or services or any container for goods." Similarly, Defendant asserts that the section 1125(a)(1)(B) claim fails because the alleged misrepresentations do not constitute "commercial advertising or promotion," but rather are mere puffery and sales talk. *See* 15 U.S.C. §§ 1125(a)(1) (1994). Based upon the parties' submissions, the Court determines that Plaintiffs have presented sufficient evidence from which a jury could reasonably conclude that the alleged misstatements made by Mestek's sales representatives were connected with goods or services, and constituted commercial advertising or promotion. *See e.g.* Pl.Ex. 16 at 96; Pl.Ex. 20 at 128-29; Pl.Ex. 18; Pl.Ex. 23 at 73-77; Pl.Ex. 24 at 23-26; Pl.Ex. 25 at 23-29; Pl.Ex. 43; Pl.Ex. 30 at 17-19; Pl.Ex. 34 at 79-80. The Court, therefore, denies Mestek's request for summary judgment on Count III.

### 5. *Counts IV-VI: Pennsylvania State Law Claims*

As noted above, Counts IV through VI are for defamation, interference with current and prospective business relations, and trade libel under Pennsylvania law.[FN13] Defendants first request that the Court grant summary judgment in their favor because Plaintiffs cannot adduce evidence of causation. The Court has already rejected this argument. *See supra* at 7-8. Since one federal claim remains in this case, the Court also will not decline to exercise supplemental jurisdiction over Plaintiffs' state law claims.

> FN13. Despite hinting that Pennsylvania law may not apply to this action, Defendants offer no alternative choice of law analysis and cite only Pennsylvania law in support of their Motion with respect to Counts IV through VI. *See* Def.Br. at 48-50. Plaintiffs also cite only Pennsylvania law. The Court, therefore, will apply Pennsylvania law to Counts IV through VI.

Defendants Reed and Dewey next argue that Plaintiffs lack a legal basis for imposing individual and personal liability on them for any misrepresentations that were made by Mestek's sales representatives. Reed and Dewey point out that Plaintiffs lack evidence that either personally made any misrepresentations. Reed and Dewey further argue that they had no legal duty to stop anyone else from making any misstatements.

*11 Under Pennsylvania law, corporate officers are only individually liable for tortious activities in which they personally participate. *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa.1983).

> The general, if not universal, rule is that an officer of a corporation who takes part in the commission of a tort by the corporation is personally liable therefor; but that an officer of a corporation who takes no part in the commission of the tort committed by the corporation is not personally liable to third persons for such a tort, nor for the acts of other agents, officers or employees of the corporation in committing it, unless he specifically directed the particular act to be done or participated, or cooperated therein.

*Id.* The touchstone for personal liability under Pennsylvania caselaw, therefore, is knowing participation in the tortious conduct. *Chester-Cambridge Bank & Trust Co. v. Rhodes*, 31 A.2d 128, 131 (Pa.1943).

The *Wicks* court interpreted this rule to allow personal liability only for misfeasance, but not for nonfeasance. *Id.*; *Chester-Cambridge Bank*, 31 A.2d at 131; *Brindley v. Woodland Village Restaurant, Inc.*, 652 A.2d 865, 868 (Pa.Super.Ct.1995). Nonfeasance is "omitting to do, or not doing, something which ought to be done, which a reasonable and prudent man would do." *Brindley*, 652 A.2d at 868 (quoting *Nelson v. Duquesne Light Co.*, 12 A.2d 299, 303 (Pa.1940)). Misfeasance "is the doing of something which ought not be done, something which a reasonable man would not do, or doing it in such a manner as a man of reasonable and ordinary prudence would not do it, in either case leading to mischief and injury." *Id.* Misfeasance requires that the defendant officer have actively or knowingly engaged in, or directed overt acts during commission of the tort. *Brindley*, 652 A.2d at 869-70. Courts will not premise liability on allegations or argument that the corporate officer merely "should have known the consequences of the liability-creating corporate act," *Wicks*, 470 A.2d at 90, or upon proof of the defendant officer's general supervisory responsibility. *Rhodes*, 31 A.2d at 131. *Kaites v. Commonwealth of Pennsylvania, Dep't of Environmental Resources*, 529 A.2d 1148, 1151 (Pa.Commw.Ct.1987). A defendant,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
**(Cite as: 2000 WL 637082 (E.D.Pa.))**

however, may be personally liable for intentional neglect, or failure to act when subject to a duty requiring action. *Bernhardt v. Needleman,* 705 A.2d 875, 878 (Pa.Super.Ct.1998); *Kaites,* 529 A.2d at 1151.

The Court determines that Plaintiffs have submitted sufficient evidence raising a genuine issue of material fact as to whether Defendants Reed and Dewey personally participated in the alleged tortious conduct in that they knew about the allegedly defamatory statements being made by Mestek representatives about Peerless, and deliberately failed to take effective remedial steps. *See e.g.* Pl.Ex. 3 at 20-24; Pl.Ex. 6 at 79-80; Pl.Ex. 7 at 27-29; Pl.Ex. 8 at 18; Pl.Ex. 9 at 14-18. Summary judgment, therefore, is inappropriate with respect to Counts IV through VI.

**IV. Plaintiffs'** Rule 56(f) **Motion for Additional Discovery**
**\*12** Plaintiffs move for additional discovery pursuant to Rule 56(f). For the following reasons, the Court dismisses Plaintiffs' Motion as moot.

**A. *Legal Standard***
Federal Rule of Civil Procedure 56(f) provides:

Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). In considering motions under Rule 56(f), the court should consider "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not been previously obtained." *Contractors Assoc. v. City of Philadelphia,* 945 F.2d 1260, 1266 (3d Cir.1991) (citation omitted). Rule 56(f) motions must be properly supported by affidavits that specifically identify the sought information and how such information would preclude summary judgment. *Gambrell v. Hess,* 777 F.Supp. 375, 378 (D.N.J.), *aff'd,* 970 F.2d 898 (3d Cir.1992).

Where the relevant information sought is in the hands of the moving party, the court should grant a

Rule 56(f) motion "almost as a matter of course unless the information is otherwise available to the non-movant." *Contractors Assoc.,* 945 F.2d at 1267. Where, however, the motion is based on speculation or raises merely colorable claims, when the party has already had an adequate opportunity to discover the information, or when the discovery request is irrelevant, the court may deny a Rule 56(f) motion. *City of Rome v. Glanton,* 958 F.Supp. 1026, 1039 (E.D.Pa.), *aff'd without op.,* 133 F.3d 909 (3d Cir.1997).

**B. *Discussion***
Plaintiffs request several items of additional discovery. The Court will deal with each in turn.[FN14] First, Plaintiffs ask to re-depose Defendants Reed and Dewey on the contents of two memoranda that discuss alternative scenarios for Mestek's ownership of the Eafco Foundry. Pl.Ex. I. The issues raised in the memoranda are allegedly relevant to Reed and Dewey's knowledge and dissemination of false and misleading statements about the affiliation between Peerless and Mestek on which their liability under Counts IV through VI rests. Since the Court has denied Defendants' Motion as to those Counts, Plaintiffs' request is moot.

> FN14. The Court will evaluate Plaintiffs' requests only within the context of the Rule 56 issues presented in Defendants' Motion, and not as general requests for discovery. Since discovery is closed, Plaintiffs are entitled to additional documents or depositions only to the extent they are necessary to oppose Defendants' arguments on summary judgment.

Second, Plaintiffs seek to re-depose Shea about his affidavit submitted in support of Defendants' Motion. The affidavit asserts that Mestek did not sell boilers at below-cost prices to a select distributor in 1998. Plaintiffs also seek production of documents showing the account detail for several categories of expenses referenced in Shea's affidavit. Plaintiffs claim that the documents are necessary to determine whether the enumerated costs are fixed or variable and are relevant to the below cost pricing issue. Peerless further seeks production of bills of materials and cost summary sheets for the months in which Mestek sold boilers to Nutley Heating and Cooling Supply ("Nutley") and Sondik Supply Company ("Sondik") to establish below-cost sales. These requests are moot since the Court has determined that Plaintiffs suc-

Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917
(Cite as: 2000 WL 637082 (E.D.Pa.))

ceeded in establishing a genuine issue of material fact as to the existence of below-cost sales.

*13 Third, Plaintiffs request the monthly reports of two of Mestek's sales representatives. These reports reveal to whom the representatives spoke and may indicate what, if any, misstatements about Peerless the representatives made. This issue is relevant primarily to Counts I, and III through VI. The Court did not grant summary judgment in favor of Defendants on Counts III through VI. Although the Court granted summary judgment in favor of Defendants on Count I, it did so without considering whether Plaintiffs presented sufficient evidence that misstatements were actually made. Rather the Court's decision rests on the principle that Mestek's sales representatives, under the circumstances presented in this case, could not as a matter of law conspire with Mestek. The reports are irrelevant to that determination. For these reasons, Plaintiffs' request is moot.

Fourth, Plaintiffs seek production of documents related to a meeting held among Mestek executives in which Peerless and the relevant market for boilers were discussed. The documents are not relevant to the Court's resolution of Defendants' Motion. Plaintiffs' request is, therefore, moot.

Lastly, Plaintiffs seek production of missing invoices for three customers on the ground that they relate to the issue of discriminatory pricing. Defendants' Motion does not challenge Plaintiffs' ability to demonstrate discriminatory pricing and the Court assumed for the purpose of resolving the Motion that such pricing took place. Therefore, Plaintiffs' request is moot.

V. Conclusion

In summary, the Court grants summary judgment in favor of Defendants on Counts I, II, and VII. Counts III, IV, V, and VI shall proceed to trial. Plaintiffs' Motion to Strike Affidavits is granted with respect to Schwaber's affidavit and denied with respect to Shea's affidavit. Plaintiffs' Motion Pursuant to Rule 56(f) is dismissed as moot. An appropriate Order follows.

ORDER

AND NOW, this __ day of May, 2000, upon consideration of Defendants' Motion for Summary Judgment (Doc. No. 51), Plaintiffs' Motion to Strike

Affidavits of Stephen Shea and Steven Schwaber (Doc. No. 64), and Plaintiffs' Alternative Motion for Order Pursuant to FRCP 56(f) (Doc. No. 54), and all the briefing submitted thereon, IT IS HEREBY ORDERED that:

VI. Defendant's Motion for Summary Judgment (Doc. No. 51) IS GRANTED in part and DENIED in part;

I. Judgment in favor of Defendant is ENTERED on Counts I, II, and VII;

II. Counts III, IV, V, and VI will proceed to trial;

VII. Plaintiffs' Motion to Strike Affidavits of Stephen Shea and Steven Schwaber (Doc. No. 64) is GRANTED in part and DENIED in part;

A. The affidavit of Steven Schwaber (Ex. A Doc. No. 63) is STRIKEN;

3. Plaintiffs' Alternative Motion for Order Pursuant to FRCP 56(f) (Doc. No. 54) is DISMISSED as moot.

E.D.Pa.,2000.
Peerless Heater Co. v. Mestek, Inc.
Not Reported in F.Supp.2d, 2000 WL 637082 (E.D.Pa.), 2000-1 Trade Cases P 72,917

END OF DOCUMENT

## Certificate Pursuant to Local Rule 7.8(b)(2)

I certify subject to Fed. R. Civ. P. 11 that the foregoing Memorandum of Law is 4,312 words and thus does not exceed the 5,000 word limit for briefs.


_____/s/_____
Elizabeth J. Goldstein, Esq.

## CERTIFICATE OF SERVICE

I, Elizabeth J. Goldstein, Esquire, hereby certify that a true and correct copy of the foregoing *Memorandum of Law in Support of Defendants' Fed. R. Civ. Pro. 12(b) Motions* was served upon Plaintiff 18KT.TV, through its respective counsel via First Class Mail postage pre-paid on May 16, 2011 and addressed as follows:

John L. Siejk, Esquire
Rosenn, Jenkins & Greenwald, LLP
15 South Franklin Street
Wilkes-Barre, PA 18711

_/s/_

Elizabeth J. Goldstein, Esquire